NOT DESIGNATED FOR PUBLICATION

No. 125,319

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

CHRISTOPHER LEE COLLINS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Labette District Court; STEVEN A. STOCKARD, judge. Oral argument held March 11, 2025. Opinion filed May 8, 2026. Convictions affirmed, sentence vacated, and case remanded with directions.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Tyler Winslow*, assistant solicitor general, *Mandy Johnson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., BRUNS and GARDNER, JJ.

ISHERWOOD, J.: Christopher Lee Collins stands convicted of attempted rape and aggravated criminal sodomy following a jury trial. He brings this direct appeal to assert that the exclusion of evidence, alongside the State's delayed amendment of its complaint and impermissible closing argument, resulted in an unjust verdict. He further contends that he is serving an illegal sentence due to confusion surrounding the appropriate classification of his prior Missouri convictions. Following a thorough review of the record in conjunction with each of Collins' claims, we are satisfied that his trial was not

1

tainted by error. However, we determined the sentencing proceeding is another matter because the district court erroneously designated Collins' prior convictions as person felonies. Accordingly, his convictions are affirmed, and his case is remanded for the limited purpose of resentencing his primary crime in accordance with the appropriate criminal history.

FACTUAL AND PROCEDURAL BACKGROUND

In 2018, the State filed charges against Collins for unlawful sex acts he perpetrated against Karly when she was under 14 years of age. Collins pled not guilty, and the case proceeded to a jury trial.

The State presented evidence through several witnesses, including Karly, that Collins sexually violated the young girl twice between January 1, 2011, and May 31, 2014, when she was between 11 and 13 years old. The first instance, which gave rise to the attempted rape charge, occurred when Collins tried, but failed to penetrate Karly's vagina. The second violation, which resulted in the charge for aggravated criminal sodomy, involved an incident when Collins subjected the young girl to anal penetration.

In addition to witness testimony, the jury had the opportunity to review photos of the home where the offenses occurred and hear recordings of Karly's interviews with investigating officers. The State also offered evidence of a prior conviction Collins acquired in Missouri between 1991 and 1993 for first-degree sexual abuse of a 12-year-old. Upon resting its case, the State requested latitude to amend its charging document for the purpose of expanding the window of time in which the offenses were alleged to have occurred from 2011 to 2013 as it currently stood, to extend through May 2014. The district court allowed the modification over defense counsel's objection.

2

The jury returned a verdict finding Collins guilty as charged on both counts. At sentencing, the district court determined Collins had a criminal history classification of A as the result of three out-of-state convictions that were scored as person felonies. The combination of that criminal history, with the victim's very young age, triggered the sentence for his aggravated criminal sodomy conviction that is mandated by K.S.A. 2013 Supp. 21-6627(a)(2)(B), requiring that Collins serve a prison term of 620 months before he is eligible for parole. For the attempted rape conviction, the district court ordered Collins to serve a concurrent prison term of 300 months before he is considered parole eligible, as required by K.S.A. 2013 Supp. 21-6627(a)(1)(B).

Collins now brings his case before this court for a determination of whether his claims of trial and sentencing errors necessitate the reversal of his convictions and a modification of his sentence. Additional facts will be discussed as required to conduct a thorough analysis of each issue presented for our consideration.

LEGAL ANALYSIS

I. *The district court did not abuse its discretion or violate Collins' right to confrontation under the Sixth Amendment to the United States Constitution when it limited the permissible scope of his cross-examination of the victim.*

Collins' first contention of error consists of the claim that the district court undermined his right to a fair trial when it refused to allow him to impeach Karly's testimony with a statement she made during an earlier law enforcement investigation. He classifies the evidence as a "prior inconsistent statement" because Karly purportedly told an officer at that time that no one ever sexually abused her yet testified at Collins' trial that he sexually abused her on more than one occasion. Collins alleges this was a critical fact for the jury to be aware of as it assessed the young girl's credibility. Collins is correct that a statement of that nature could potentially impact an offender's case, particularly when a credibility contest between the victim and an offender plays a key role. But our

3

interpretation of the statement at issue and its surrounding circumstances is distinctly different from Collins' and forecloses the reversal of his convictions that he requested. A thorough analysis of this issue necessitates an expansion of the factual backdrop we offered above.

In late fall of 2016, the Parsons Police Department was dispatched to conduct a welfare check at a local restaurant where an older juvenile was refusing to return home to his stepfather because he was afraid. Corporal Cheryl Siu responded to the call and, upon arrival, contacted the 17-year-old juvenile, as well as his two younger siblings, one of whom was Karly. The three were at the restaurant with their grandparents. Siu spoke with the older sibling and learned he did not want to go home because their stepfather sold drugs. In response to Siu's inquiry, the juvenile asserted that his stepfather never abused or struck him. At that point, the youngest of the three told Siu that their stepfather had just sent Karly a text, cussed at her, and said he was on his way to pick them up. Collins is not the children's father or biologically related to them in any way.

Corporal Siu spoke with the grandmother next and learned that Karly was in the ladies' room crying because their stepfather cussed at her and she was afraid to return home. Siu then spoke with Karly directly who reported that she was upset about her stepfather's involvement with drugs and because he swore at her. In response to a question from Siu, Karly denied that "there was any abuse in the home." At that moment, however, Karly's gaze shifted to her grandmother who nodded her head which in turn prompted Karly to change her answer. The officer requested to speak with the young girl alone and once it was just the two of them Siu again inquired "if her dad was abusing her." Karly repeated her initial negative response but complained that her stepfather never allows her to go anywhere or do anything. Siu explained those things do not constitute abuse and asked, for the third time, whether "her dad had physically abused her." Karly again responded "no."

Corporal Siu escorted Karly back to the play area and reunited her with her family. The oldest child told Siu that while the kids never mentioned their feelings about their stepfather to anyone before, their stepfather is "possessive and strict and never lets him do anything or go anywhere." At that point, the grandmother informed Siu that the children's stepfather essentially held them hostage and subjected them to emotional abuse.

The stepfather had arrived at the restaurant moments before, so Corporal Siu went outside to speak with him and gain a better understanding about any dissension or recent events that transpired in the home. Afterwards, Siu spoke briefly with the grandmother and the siblings and told them that the children needed to return home. The grandmother protested and asserted that stepfather's emotional abuse compromised the children's well-being. Siu explained that the investigation failed to yield anything that justified the children's removal from the home.

The stepfather agreed to allow law enforcement officers to conduct a check of his residence. Upon arrival at the home, Corporal Siu waited outside with the children while her colleague performed the walk-through. The grandmother stopped by while they were waiting and, when she remarked again about the stepfather's emotional and physical abuse, Siu directed her to submit a written statement at the police station. Later that day, Siu reviewed grandmother's written statement and noted that she expressed a new concern that Karly was being sexually abused. Siu referenced that statement in her report when documenting the incident at the restaurant and accompanied it with the fact that she asked Karly "several times" about any abuse and the young girl did not say anything to substantiate that there was a cause for concern.

The restaurant incident became a point of contention during trial when defense counsel attempted to explore the issue during his cross-examination of Karly. The State objected to the line of questioning as counsel's impermissible use of a specific instance of

5

conduct to attack a trait of Karly's character in violation of K.S.A. 60-420 and K.S.A. 60-422. The parties retired to the judge's chambers so Collins' counsel could provide a complete proffer of the evidence he sought to admit and explain its relevance to the case.

Collins' counsel informed the judge that he intended to ask Karly about her interview with Corporal Siu at the restaurant, primarily her assertion that her stepfather cussed at her and it made her afraid to go home. Counsel claimed that law enforcement officers looked at the stepfather's text and determined that Karly's characterization of the message was not accurate, so in counsel's opinion that called Karly's credibility into question. The district court observed that the encounter at the restaurant was a "wholly unrelated incident [that] had nothing to do with [Collins' case]," and was an improper use of a specific instance of Karly's conduct, bearing on her credibility. Collins' counsel countered that K.S.A. 60-420 clearly paved the way for him to ask "anything that is relevant" about Karly's credibility, including her characterization of their stepfather's message, which counsel stated was the only evidence he wanted to admit. The district court advised that the principle underlying prior inconsistent statements contemplates the existence of contradictory statements, in that they contradict a statement the witness testified to. But in Collins' case that was lacking because nothing in Karly's testimony opposed her earlier description of her stepfather's texts.

The judge and the attorneys continued to tease out the nuances of the issue and, as they did so, Collins' counsel gravitated toward a new claim—that during her interview with Corporal Siu, Karly allegedly asserted she was never sexually abused. It was defense counsel's position that statement directly contravened Karly's trial testimony that Collins sexually abused her on more than one occasion, making it admissible as a prior inconsistent statement. He acknowledged the report memorialized an incident involving Karly's stepfather, but argued Collins was implicated because the statement at the end of the report was simply that Karly's grandmother was concerned the young girl was sexually abused. A finger was not pointed at a particular perpetrator. Thus, because that

6

generalized comment allowed Collins to fall within the scope of potential suspects, correspondingly he should be able to avail himself of the benefit of the prior inconsistent statement.

The district court reviewed Corporal Siu's report in its entirety but remained firm in its initial conclusion that because the report contained no mention of Collins, its contents had no relation to the present case, so the statement was inadmissible. Its ultimate ruling offered two justifications for exclusion of the statement:

> "I believe it is left within the sound discretion of the Judge, it is such an unrelated incident, so far removed from the allegations in this case, it is not an inconsistent statement. I believe the law says that as to credibility you can only introduce, to impeach credibility, prior convictions for crimes related to truth or veracity and that's my ruling. So that's inadmissible as well."

Thus, in the absence of any showing that there were specific concerns on that day about Collins sexually abusing Karly, the evidence was inadmissible. Only the first of the two analytical avenues articulated by the district court was actually triggered in Karly's case. Accordingly, our analysis will be confined to that theory.

Returning now to Collins' first claim of error, he contends the district court erred by limiting his cross-examination of Karly. The law is clear that district courts are permitted to exercise reasonable control over the scope of cross-examination. *State v. Corbett*, 281 Kan. 294, Syl. ¶ 4, 130 P.3d 1179 (2006). We review the limitations the district court placed on defense counsel's cross-examination of Karly for an abuse of discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). Similarly, a district court's refusal to allow the introduction of a prior inconsistent statement is likewise reviewed for an abuse of discretion. *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004). As the party alleging error, Collins bears the burden to prove that such abuse occurred. *Thomas*, 307 Kan. at 739. A district court's determination regarding the proper

7

limitations to place on such evidence will not be reversed on review except for those instances when an abuse of judicial discretion affirmatively appears to have affected the substantial rights of the complaining party. *State v. Hall*, 220 Kan. 712, 716, 556 P.2d 413 (1976).

An abuse of discretion is said to exist when no reasonable person would have taken the view adopted by the district court, or when the challenged judicial action has either a legal or factual error as its foundation. *Thomas*, 307 Kan. at 739. We exercise unlimited review over any legal standards that a district court relied on when making its discretionary decision. *State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010). The factual foundation that undergirds its decision will be reviewed with an eye toward whether it is supported by substantial competent evidence in the record. *State v. Parks*, 294 Kan. 785, 797, 280 P.3d 766 (2012).

As a preliminary matter, we note that in presenting his case to us, Collins asserts:

"In 2016—several months before [Karly] accused [Collins] of anything—*Karly spoke with law enforcement about Karly's grandmother's concerns that Karly was being sexually abused*. The officer who spoke to Karly reported that: '[Karly] was asked several times by me and did not indicate any abuse.' Karly's 2016 statement was inconsistent with her trial testimony accusing [Collins] of wrongdoing." (Emphasis added.)

He then argues:

"Contrary to the district court's analysis, Karly's failure to mention [Collins] *when asked about possible sexual abuse* is exactly what makes the 2016 denial both relevant and impeaching." (Emphasis added.)

But that is not a particularly accurate portrayal of the factual landscape the record provided for our analysis. Rather, when viewed alongside the summary we set out above,

8

it is evident Collins has sanded down the edges of the facts to ensure they fit within the confines of his preferred narrative. That is, despite his intimations to the contrary, Karly never specifically "spoke with law enforcement" during that incident about her "grandmother's concerns that [Karly] was being sexually abused," nor was Karly ever "asked about possible sexual abuse" by anyone during that investigation with which to "[fail] to mention [Collins]" as a perpetrator.

Corporal Siu's report is the factual font from which Collins attests to having extracted the details for this amalgamation. That report is part of our record on appeal. Siu's narrative of the incident reflects that sexual abuse was not even mentioned that day until the children's grandmother included it in the written statement she drafted at the police station well after the matter concluded and the parties dispersed. It bears mentioning that grandmother actively advocated for the children that day and spoke with Siu three separate times during the investigation, twice at the restaurant and once when she followed the officer to the stepfather's home afterwards. On both occasions when the grandmother had Siu's undivided attention at the restaurant, grandmother only asserted that the children were emotionally abused by their stepfather. Afterwards, when she spoke with Siu outside the stepfather's residence, the grandmother only inquired about physical and emotional abuse.

Finally, and more specifically, Corporal Siu's encounter with Karly occurred roughly two to three years after she was sexually violated by Collins. From the inquiries posed during the investigation, as evidenced by the overall context of Siu's report, it is without question that the officer's interaction with Karly on the day at issue was solely to conduct a probe into the conduct allegedly committed by Karly's stepfather alone.

With the factual backdrop clarified, we return to the gist of Collins' claim which is that the district court erred when it declined to allow defense counsel to explore Karly's allegedly prior inconsistent statement during his cross-examination of her. It is Collins'

position that pursuant to K.S.A. 60-420 the "'general rule'" is that an impeaching party is free to present evidence of "'any other matter relevant upon the issues of credibility.'" He then offers an analysis for the purpose of demonstrating that the district court violated K.S.A. 60-420, and thereby abused its discretion, when it refused to allow Collins to impeach Karly with her prior statement.

The State conducted a narrowly tailored direct-examination of Karly and largely confined its inquiry to a pursuit of only those details necessary to substantiate the charges against Collins. It is not essential that we recount those sensitive specifics for our analysis of the current issue. Karly testified that both instances of sexual abuse occurred prior to May 2014, and she unequivocally identified Collins as the perpetrator. She explained that the first sexual violation occurred at Collins' home when she was 12 or 13 years old. Karly then testified that Collins subjected her to a second sexual act, on a different date, in the home she lived in with her family.

The district court engaged the parties in a fairly in-depth hearing to address defense counsel's desire to cross-examine Karly regarding the restaurant incident. Following extensive arguments from counsel and a review of Corporal Siu's narrative report, the district court summarized the details of the day in question. It explained that law enforcement was dispatched to investigate a claim of emotional abuse inflicted upon Karly and her siblings by their stepfather specifically. That investigation did not lead Siu to conclude that the children's physical or emotional well-being was in jeopardy and necessitated their removal from the stepfather's home. Accordingly, the children were sent home with their stepfather. The district court acknowledged that the children's grandmother submitted a written statement at the police station afterwards to communicate her concern that Karly was sexually abused. Siu's report verified that she asked Karly about abuse several times during the investigation, but the young girl never gave Siu any indication there was cause for concern.

10

The district court highlighted the fact that Collins was never mentioned at any point during Corporal Siu's narrative and that nothing in the report bore any relation to him. Accordingly, it found that Karly's repeated denials of abuse to Siu were inadmissible because it was not shown that when her grandmother made the statement regarding sexual abuse, she was specifically concerned that Collins was the perpetrator.

K.S.A. 60-420 provides the general rule for admissibility of impeachment evidence:

> "Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

Both K.S.A. 60-421 and K.S.A. 60-422 limit the admissibility of impeachment evidence under K.S.A. 60-420. Specifically, K.S.A. 60-421 limits the admissibility of impeachment evidence pertaining to a witness' prior convictions, which is not applicable here. K.S.A. 60-422 further limits the admissibility of impeachment evidence, including prior inconsistent statements, as follows:

> "As affecting the credibility of a witness (a) in examining the witness as to a statement made by him or her in writing inconsistent with any part of his or her testimony it shall not be necessary to show or read to the witness any part of the writing provided that if the judge deems it feasible the time and place of the writing and the name of the person addressed, if any, shall be indicated to the witness; (b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement; (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

11

The first problem with Collins' analysis is that it assumes a prior inconsistent statement into existence that was never actually uttered and then forges ahead with the argument that its exclusion was improper because "*any evidence* bearing on witness credibility is admissible." But this theory of broad admissibility that Collins advocates for is subject to certain statutory limitations and foundational requirements. K.S.A. 60-420 generally allows any party to admit evidence relevant to the credibility of a witness. For purposes of this case the first hurdle that must be cleared is whether the prior assertion truly qualifies as an "inconsistent statement."

We pause to note that when Collins' counsel initially embarked down this road when proffering his evidence to the district court, the statement he relied on as the foundation for his claim was Karly's assertion that her stepfather cursed her, via text, and that it left her fearful to go home. Corporal Siu reviewed the message and apparently did not share Karly's interpretation that the word choice amounted to swearing. The discrepancy prompted defense counsel to argue at the hearing that law enforcement officers "verified" that Karly's characterization of the text was "not accurate." Thus, it necessarily called her credibility into question and he had a right to explore that issue. Collins did not opt to carry that particular argument forward on appeal, so it is properly deemed abandoned and will not play a role in our analysis. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.).

A prior inconsistent statement is one that is made by a witness outside of court that contradicts or is inconsistent with how the witness testified at trial. *State v. Gauger*, 200 Kan. 515, 520, 438 P.2d 455 (1968). Such statements may be used for impeachment purposes at trial provided specific foundational requirements are first met. See K.S.A. 60-420; K.S.A. 60-421; K.S.A. 60-422. A witness achieves what has been described as "turncoat status" when their trial testimony deviates from a previous statement they offered regarding the issue. *State v. McMullen*, 290 Kan. 1, 7, 221 P.3d 92 (2009) (citing *State v. Miller*, 284 Kan. 682, 710, 163 P.3d 267 [2007]).

12

While arguably one of the earliest cases to address the issue, *Leinbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 10 P.2d 33 (1932), nevertheless offers a useful lens for clarifying this first step of the inquiry. The Kansas Supreme Court explained that "'it is not a mere difference of statement that suffices; nor yet is an absolute oppositeness essential; it is an inconsistency that is required.'" 135 Kan. at 50. The court emphasized that "'this inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or effect* of what has been said or done.'" 135 Kan. at 50. The key inquiry is whether "'the two expressions appear to have been produced by inconsistent beliefs.'" 135 Kan. at 50 (quoting 2 Wigmore on Evidence, 2d ed., pp. 492-93, 495). This distinction matters because statements that merely elaborate on or provide additional details to trial testimony, without actually contradicting it, do not qualify as inconsistent statements suitable for use as an impeachment tool. *Hancock v. Bevins*, 135 Kan. 195, 197-98, 9 P.2d 634 (1932). The purpose of admitting the prior testimony is to induce the trier of fact to discard one statement and leave the other because both cannot be true. 135 Kan. at 197-98; see also *State v. Worth*, 217 Kan. 393, 396, 537 P.2d 191 (1975) (to be proper impeachment material a witness' prior statement must contradict or be inconsistent with their testimony).

The opinion from this court in *State v. Stinson*, 43 Kan. App. 2d 468, 227 P.3d 11 (2010), and more recently, the Kansas Supreme Court's opinion *State v. Frantz*, 316 Kan. 708, 724, 521 P.3d 1113 (2022), illustrate that the concepts articulated above regarding the use of a holistic or more comprehensive consideration of factors when endeavoring to determine whether or not a particular statement is inconsistent, has withstood the test of time. In *Frantz*, the court considered a statement made by Frantz' son that he was depressed because his mother was in custody for killing his stepfather, in conjunction with his trial testimony that he believed his mother committed the crime. It concluded there was "no incongruity" between them because both statements could properly be viewed as expressions the son made about his mother's guilt for the offense charged. 316 Kan. at 724. That is, because the son's prior statement about his depression did not

13

contradict his trial testimony about his mother's culpability, the statements fell outside the scope of what is considered proper impeachment material. 316 Kan. at 724.

Returning to our case, Collins cites Corporal Siu's report as the foundation for his contention that incongruity existed at trial because "[i]n 2016, Karly denied any history of sexual abuse" and that "general denial that any sexual abuse had occurred was inconsistent with Karly's trial accusations that [Collins] had abused her on two occasions between 2011 and 2014." But Siu's narrative does not offer any indication that Karly ever made the negative assertion Collins is relying on. Breaking that report down to the components that Collins might highlight to shore up his claim, we note the following:

1. During Corporal Siu's first exchange with Karly upon learning that the young girl was afraid to go home with her stepfather, the officer inquired "if there was any abuse in the home." Karly initially stated there was not but changed her answer when she observed her grandmother nodding at her. Siu specifically tailored her inquiry to any conduct perpetrated by Karly's stepfather in the home that she and her siblings shared with him. Collins is not the children's stepfather, and there is no indication Collins lived in the residence with them.

2. Corporal Siu asked the grandmother to leave the room after which the officer asked Karly "if her dad was abusing her." Karly provided a negative response and complained that he just would not allow her to go anywhere. Siu explained that did not qualify as abuse and inquired again "if her dad had physically abused her." Karly repeated that he did not. There is nothing about Karly's statements that reasonably allows for the interpretation that Siu was inquiring about someone other than Karly's stepfather or any violative acts other than physical or emotional abuse.

14

Applying the full spectrum of factors, including, who was present at the time the statement was made, its precise content, and the context in which it was uttered, we are satisfied the district court made the correct call when it found that the remarks Karly made to Corporal Siu were not admissible as prior inconsistent statements. *Leinbach*, 135 Kan. at 50 (The key inquiry is whether "'the two expressions appear to have been produced by inconsistent beliefs."). "'[E]xplanations and denials run the gamut of human ingenuity, ranging from a flat denial, to an admitted excuse, to a slant, to a disputed explanation, or to a convincing explanation'; a statement could fall at any point on this spectrum and still be inconsistent." *United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018). The fact remains the statements must still fall somewhere on that spectrum of inconsistency and the assertions Collins relies on simply do not. Rather, the initial statements merely communicated that Karly was not physically or emotionally abused by her stepfather in the fall of 2016. Those assertions are distinctly different from but *not inconsistent* in any way with her trial testimony that Collins sexually abused her twice between 2011 and May 2014. Accordingly, those statements were properly excluded.

Collins argues that "[p]iling up impeachment" was central to his defense and the district court should have afforded him the opportunity to offer a "pattern of denials" by Karly to ensure that his rights under the Confrontation Clause were adequately protected. We recognize that the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights grant one accused of a crime a fundamental right to confront those witnesses offered against them. *State v. Blue*, 225 Kan. 576, 579, 592 P.2d 897 (1979). But while fundamental, that right is not unlimited and is properly considered satisfied when a defendant receives the opportunity to cross-examine their accuser. *State v. McMullen*, 290 Kan. 1, 8, 221 P.3d 92 (2009). That is, "'[t]he substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination.'" *Crawford v. Washington*, 541 U.S. 36, 57, 124 S. Ct. 1354, 158 L. Ed. 2d

15

177 (2004) (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S. Ct. 337, 39 L. Ed. 409 [1895]).

Pertinent to this issue, the record reflects that Sonya Fitzgibbon was among the witnesses for the State. Fitzgibbon was a social worker with the Department for Children and Families (DCF) who assisted with the investigation into Karly's accusations against Collins. Part of her role involved interviewing Karly, which occurred just two days after she was questioned by Corporal Siu at the restaurant. According to Fitzgibbon, Karly reported that "'her dad does not touch her private areas and no one else has.'"

Later, while Karly occupied the witness stand at trial, Collins' counsel presented her with a copy of Fitzgibbon's report and asked whether she remembered the interview. Karly recalled that the meeting occurred but struggled to remember the specifics of their exchange. Collins' counsel inquired if she remembered telling Fitzgibbon that "no one has touched your private areas" even though that interview postdated the time frame when Collins allegedly molested her. Karly testified that she did not recall that, so Collins' counsel moved on and pursued a different line of questioning.

The record bears out that Collins also seized upon opportunities to undermine Karly's credibility during the presentation of his own case. First, he chose to call Fitzgibbon back to the witness stand. During her brief testimony, defense counsel revisited the interview Fitzgibbon had with Karly in 2017 and elicited from Fitzgibbon that during their meeting, Karly denied that she was ever sexually abused. Collins also called Karly's stepfather to testify for the express purpose of discrediting Karly's recollection that one of the incidents occurred in a room in their home where a broken window was covered by blankets. According to her stepfather, the window at issue was not broken until approximately three or four years after the time frame Karly assigned to the violations.

16

The State called Karly to testify again during the rebuttal portion of its case for the very limited purpose of explaining why she denied the sexual abuse during her interview with Fitzgibbon and to respond to her stepfather's testimony about the window. During cross-examination, Collins' counsel highlighted that merely one day earlier, while under oath, Karly purported to not know what he was referring to when he questioned her about the interview with Fitzgibbon, yet in the present moment she had greater clarity. Defense counsel intimated that perhaps Karly's newly crystallized thoughts were the product of discussing the matter with the State, but she denied that was true. He clarified one final time before concluding his questioning that during the interview with Fitzgibbon in 2017, Karly undeniably told her that "no one has touched [her] private parts."

A fundamental aspect of a trial's fairness hinges on the defendant's exercise of the fundamental right to test the reliability of critical testimony "'in the crucible of cross-examination.'" *State v. Brooks*, 297 Kan. 945, 953, 305 P.3d 634 (2013) (quoting *Crawford*, 541 U.S. at 61). As outlined above, Collins' counsel effectively cross-examined Karly two different times. Collins' jury, by virtue of his counsel's advocacy, heard on three separate occasions, including once from Karly personally, that when interviewed by Fitzgibbon in 2017, Karly denied that she was ever sexually abused by anyone. His counsel also highlighted for the jury that while testifying under oath, Karly claimed to not recall making the denial during her interview with Fitzgibbon, but experienced improved recollection while testifying the following day. Finally, counsel utilized testimony from Karly's stepfather as an additional opportunity to cast doubt on her credibility by contradicting her description of the room where one of the incidents occurred.

"'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Waterman*, 63 Kan. App. 2d 799, 817, 540 P.3d 378 (2023) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L.

17

Ed. 2d 674 [1986]). The district court properly concluded that the assertion Karly made to Corporal Siu during the investigation concerning Karly's stepfather, between two and three years after she was sexually abused by Collins, did not constitute a prior inconsistent statement and was therefore inadmissible. Accordingly, we decline to find that the district court abused its discretion through the commission of a legal error that compromised Collins' right to a fair trial.

II. *Did the district court err in granting the State's motion to introduce evidence of Collins' prior out-of-state conviction for sexual abuse, pursuant to K.S.A. 60-455(d), to establish his propensity to engage in sexual misconduct?*

In a prosecution for sex offenses, K.S.A. 60-455(d) explicitly allows the introduction of evidence to establish other instances of sexual misconduct to demonstrate the defendant's propensity to commit such acts or for any other matter to which the evidence is relevant and probative. Collins' second claim of error in his appeal is that the district court erred when it allowed the State to use that statutory vehicle to introduce evidence of his 1993 Missouri conviction for first-degree sexual abuse. He contends that his prior crime does not constitute an "'act or offense of sexual misconduct'" as contemplated by K.S.A. 60-455(g). He also argues that the district court abused its discretion when it concluded that the probative value of his prior conviction outweighed its prejudicial effect.

The State counters that the manner in which Collins framed the issue on appeal is distinctly different than the theory he relied on when challenging admission of the evidence before the district court and, as such, it was not properly preserved for our review. It further asserts that the district court did not abuse its discretion when it determined that the probative value of Collins' prior conviction outweighed its prejudicial effect.

*Additional relevant facts*

Before trial, the State moved, pursuant to K.S.A. 60-455(d), to admit evidence of Collins' 1993 Missouri conviction for first-degree sexual abuse. Collins filed an objection and largely confined his counterargument to the claim that K.S.A. 60-455(b) requires that proposed evidence of an offender's prior bad acts or misconduct must be related to one of the statutorily provided for factors—including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident—before it is allowed into evidence in a sex crime prosecution. That is, it is not admissible solely for the purpose of establishing a defendant's propensity to engage in such conduct. He also argued that evidence of his prior conviction was immaterial, lacked probative value, and was unduly prejudicial. Collins asserted that the State was pursuing admission of the evidence solely to support its narrative that he is disposed to committing sex offenses.

The district court conducted a hearing to resolve the matter and ultimately granted the State's motion. Relying on *State v. Boysaw*, 309 Kan. 526, 439 P.3d 909 (2019), the district court found that the prior conviction was admissible as propensity evidence in accordance with K.S.A. 60-455(d). The judge also determined that the probative value of the evidence far outweighed any possible prejudicial effect. Collins' counsel renewed his objection at trial.

The admission of evidence lies within the sound discretion of the district court. An appellate court's standard of review for the admission or exclusion of evidence is abuse of discretion. *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004). An abuse of discretion occurs when the challenged decision is the product of either legal or factual error. It has also been found when the district court's decision was arbitrary or unreasonable. *State v. Ross*, 310 Kan. 216, 224, 445 P.3d 726 (2019). Collins' claim arises out of what he contends was the district court's erroneous interpretation of the

requirements and limitations of K.S.A. 60-455. We review issues of statutory interpretation de novo. *State v. Mora*, 315 Kan. 537, 541, 509 P.3d 1201 (2022).

Before advancing into the merits of Collins' claim, we must first determine whether the issue was properly preserved for our review through a timely and specific objection to the district court. Collins assures us that the issue was properly preserved because he renewed his pretrial arguments that the prior conviction "should not be admitted under K.S.A. 60-455(d)." The State counters that while Collins' counsel objected at trial, it was only to reiterate his pretrial claims that the evidence was inadmissible because it was not sufficiently similar to his current offenses, it did not address a material issue that was in dispute, and, because it occurred 25 years earlier, it was too old to carry any real probative value.

K.S.A. 60-404 governs the preservation of evidentiary issues and generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. A party may not object at trial to the admission of evidence on one ground and then swap it out for a different argument on appeal. *State v. Showalter*, 318 Kan. 338, 362-63, 543 P.3d 508 (2024). The issue we must resolve through a review of the record is whether the nature of Collins' objection before the district court necessarily gave that judge the opportunity to issue a ruling on the claim that Collins now argues on appeal. *State v. Scheetz*, 318 Kan. 48, 58, 541 P.3d 79 (2024). That is, that the propensity evidence associated with his prior conviction did not meet the definitional requirement set out under K.S.A. 60-455(g).

The first opportunity Collins had to take a position on this issue was in the written response he filed to the State's motion that sought to introduce evidence of Collins' 1993 conviction. At that time, Collins opted to argue that the evidence was inadmissible because it failed to satisfy the statutory requirement for relevance of any factor set out under K.S.A. 60-455(b). Those being motive, intent, identity, opportunity, plan, or

absence of mistake or accident. We have thoroughly reviewed Collins' 14-page response and find it contains scant substantive references to K.S.A. 60-455(d), but no references to subsection (g) or anything remotely similar to the comprehensive analysis of subsection (g) that accounts for roughly 13 pages of his appellate brief.

Collins' counsel did renew his objection on two separate occasions at trial. First, during a recess required to address a separate issue, defense counsel requested a "standing objection" to the admission of evidence concerning his prior conviction on the grounds that "it is irrelevant and it is prejudicial, despite the Court's ruling on the [K.S.A. 60-]455 motion." Later in the trial, as the State made overtures to introduce the evidence through its witness, Collins' counsel objected once again stating simply, "I've made my prior objections to this issue on the record." We are not satisfied that defense counsel's written response or either of the two oral objections communicated that he believed the evidence was inadmissible because it failed to satisfy the specificity requirement of K.S.A. 60-455(g). We recognize that exceptions exist when a party seeks appellate review of an issue that was not accompanied by a contemporaneous objection before the district court. But, K.S.A. 60-404 does not allow extension of those exceptions to claims that challenge the admissibility of evidence. *State v. Carter*, 312 Kan. 526, 535, 477 P.3d 1004 (2020).

The Kansas Supreme Court was presented with a very similar issue in *Scheetz* when Scheetz argued for the first time on appeal that the State's propensity evidence was inadmissible under K.S.A. 2022 Supp. 60-455(g). He asserted the State's evidence did not satisfy any of the 10 specific types of conduct defined as an "'act or offense of sexual misconduct'" in subsection (g). 318 Kan. at 60. But the record revealed that the specific objection he entered at trial was "that the internet search history did not qualify as an 'act or offense of sexual misconduct' *because* it contained 'nothing illegal.'" 318 Kan. at 60.

The court clarified that preserving an evidentiary challenge is not merely an option or a best practice. Rather, K.S.A. 60-404 requires a timely and specific objection. It explained that specificity requirement in the following way:

> "'The Kansas Legislature has established the rule for evidentiary objections by statute. The legislature, not this court, requires that the objection at the trial court to the admission of evidence "make clear the *specific* ground of objection." Otherwise, the verdict cannot be set aside. Under the separation of powers doctrine, this court has no constitutional authority to essentially negate the legislature's decision to require a specific ground of objection in the trial court by then allowing a different objection to be argued in the appellate court. [Citations omitted.]'" *Scheetz*, 318 Kan. at 59 (quoting *State v. McCaslin*, 291 Kan. 697, 709-10, 245 P.3d 1030 [2011]), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014).

The court found that it was without question from the trial transcript that Scheetz neglected to preserve his subsection (g) definitional issues for appellate review. 318 Kan. at 60. Where the clear, statutory process of K.S.A. 60-404 was not followed, Scheetz' claim was not properly before the appellate courts for review. 318 Kan. at 61. Given what our record reveals about the history of Collins' objections and the similarities his case shares with Scheetz, we see no reason to pursue a different course than the Supreme Court. Collins' failure to preserve his claim in accordance with the process mandated by statute and caselaw forecloses appellate review of the issue.

*The probative value of the prior conviction outweighed its prejudicial effect.*

While Collins failed to preserve his arguments under K.S.A. 60-455(d) and (g), he did argue before the district court that the prejudicial effect of the prior conviction outweighed its probative value. Thus, this claim is not beyond our reach. Collins takes the position that the probative value of his Missouri conviction is diminished by the fact

22

he was only 16 years old when the act was committed and 18 years old when it was charged, and roughly 28 years had passed since he was convicted.

When a defendant is accused of a sex offense, evidence of their "commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 60-455(d). Before admitting propensity evidence, however, the district court must still determine whether its potential prejudice outweighs the probative value it carries. *State v. White*, 316 Kan. 208, 215, 514 P.3d 368 (2022). We analyze this issue for an abuse of discretion. *State v. Claerhout*, 310 Kan. 924, 927-28, 453 P.3d 855 (2019). As noted previously, an abuse of discretion occurs when a district court's decision is arbitrary, fanciful, or unreasonable, or if it is based on an error of law or fact. *White*, 316 Kan. at 213.

The Kansas Supreme Court has counseled that when evaluating what probative value the evidence of prior crimes might hold, the district court should consider the following factors:

> "how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." *Boysaw*, 309 Kan. at 541.

The district court in Collins' case followed that guidance and concluded that the probative values associated with Collins' prior conviction surpassed any possible undue prejudice it might also have:

"The prior act was clearly proved, by a guilty plea by Collins. The evidence is highly probative of the important material fact of intent, that is, the propensity of Collins to commit a sex act with a child. It is presumed by the court that Collins will seriously dispute the material fact of intent, and there is no other way the government can obtain less prejudicial evidence of propensity or intent. On the other hand, there is some possibility that a jury will give undue weight to a prior conviction, but this can be addressed through a jury instruction, and the court finds there is little chance this evidence will distract the jury from the central issues of the trial or that it will be unduly time-consuming."

The district court's decision and Collins' brief both rely heavily on *Boysaw*, 309 Kan. at 538-42, to support their respective positions. There, the district court admitted evidence of Boysaw's prior conviction for sexual assault of a child. On appeal, Boysaw argued that the district court came down on the wrong side of the probative-value-undue-prejudice balancing test. The Kansas Supreme Court was not persuaded and upheld the conclusion reached by the district court. 309 Kan. at 542.

While the prior conviction in *Boysaw* was entered 26 years before trial, the prior conviction and the later offense both involved a particular class of victims and similar offensive conduct. Accordingly, the *Boysaw* court declined to "conclude that no reasonable person would have weighed the evidence in the manner that the district court did or that the admission of the evidence was improper as a matter of law." 309 Kan. at 542.

Collins correctly states that the district court was not necessarily bound by *Boysaw* because that case "merely holds that—under the totality of the circumstances presented to the district court in *Boysaw*—the court did not abuse its discretion in finding that Boysaw's 26-year-old conviction was not overly prejudicial." As Collins accurately states, the *Boysaw* court determined that, under the totality of the circumstances, the district court did not abuse its discretion in admitting evidence of the prior conviction.

24

The same factors that supported admission of the prior conviction in *Boysaw* are present here. In both Collins' 1993 Missouri case and his current case, Collins subjected an early adolescent girl—less than 12 years old in the 1993 case and less than 14 years old in the current case—to sexual contact. The prior conviction is thus highly probative of Collins' intent to commit a sex act with a child.

Finally, while Collins' relative youth at the time of the 1993 conviction is one feature that distinguishes his case from *Boysaw*, it does not create a significant enough disparity for us to find that the district court's decision here was unreasonable and amounted to an abuse of discretion. Collins was prosecuted as an adult for the unlawful sexual acts he perpetrated in Missouri, so we are satisfied the record sufficiently refutes Collins' contention on appeal that his offense committed as a teenager "cannot be viewed the same way as offenses committed by an adult." Therefore, the district court did not abuse its discretion by finding Collins' age at the time of the 1993 conviction was a less than compelling factor.

*Conclusion*

Under K.S.A. 60-404, appellate courts are generally precluded from reviewing an evidentiary challenge absent a timely and specific objection made on the record. Collins' failure to preserve his argument that evidence of his 1993 Missouri conviction for sexual assault was inadmissible under K.S.A. 60-455(d) and (g) leaves it beyond the permissible scope of our review.

Collins did preserve his argument that the district court abused its discretion when it concluded that the probative value of his prior conviction outweighed its prejudicial effect. Following a thorough analysis of the record and the claim, however, we did not arrive at the same conclusion as Collins. The decision of the district court is affirmed.

III. *Did the district court abuse its discretion when it allowed the State to amend its complaint on two separate occasions for purposes of adjusting the date range for when the crimes allegedly occurred?*

Collins next claims that the multiple amendments the State was permitted to make to its complaint resulted in prejudice to him. He contends the first modification that the State made in 2019 undermined his constitutional right to a speedy trial, while the 2021 amendment compromised his due process right to notice. In response, the State largely rests on K.S.A. 22-3015(a) and notes it did not subject Collins to any new or different crimes. It also directs us to those authorities that have favored the State's ability to amend the time frames alleged in prosecutions for child sex crimes.

*Additional relevant facts*

The initial complaint filed by the State alleged that Collins committed the charged offenses between August 1, 2014, and November 30, 2014. That time period was later amended to encompass the entire calendar year of 2014. Then, on the morning the trial was scheduled to begin, the State again sought to amend the date range because after speaking with Karly during trial preparations, it determined that the correct time frame was between January 1, 2011, and December 31, 2013. Collins objected on the grounds that his defense was tailored to the 2014 time frame, so if the request was granted, a continuance was necessary to enable him to alter his defense theory. The district court allowed the State to amend the complaint with the new date range and continued the trial.

Once the trial commenced and the State concluded its case-in-chief, it again requested leave to amend the time frame for when the acts occurred. Based on Karly's testimony, the more appropriate window was between January 1, 2011, and May 31, 2014. Collins objected on the grounds that another amendment would essentially force him to defend against a moving target of dates and would thus be unduly prejudicial. The district court overruled Collins' objection and explained that he would have the

26

opportunity to impeach Karly with respect to any discrepancies in her claims as to when the acts were committed.

*Standard of review*

Kansas courts review a district court's decision to grant a motion to amend an information for abuse of discretion. An abuse of discretion occurs if the decision is arbitrary, fanciful, or unreasonable, or when it is the product of legal or factual error. *State v. White*, 316 Kan. 208, 213, 514 P.3d 368 (2022).

K.S.A. 22-3015(a) affords the State considerable flexibility in tailoring the complaint to its case so long as its amendment(s) does not deprive a defendant of the opportunity for notice and to be heard or expose them to new or different charges. The State also receives a fair amount of latitude when charging the time periods for child sex crimes given the struggle children often face when attempting to provide specifics in that regard. *White*, 316 Kan. at 214.

Here, the State's amendments did not require Collins to prepare a defense for new and unanticipated offenses. In truth, their substance remained unchanged throughout the entire case. Therefore, the only issue for this court to analyze is whether the modification exposed Collins to substantial prejudice. "In assessing prejudice, [this court] consider[s] whether (1) the date was a critical issue; (2) the change implicates the statute of limitations; (3) the amendment affects an alibi defense; (4) time was an element of the offense; or (5) there is any surprise to the accused." *White*, 316 Kan. at 213-14.

With respect to the amendment that was permitted on the morning of the original trial setting, Collins argues that his right to a speedy trial was adversely affected because that amendment ultimately delayed his trial for more than two years. But Collins' argument ignores the fact that he was the one who requested that the trial be continued so

27

he could prepare a defense for the new date range. And after the amendment of the complaint in August 2019, a new trial date was set three months later in November 2019, and Collins waived his right to speedy trial for two of those three months. Finally, Collins neglects to acknowledge that the November proceeding ended prematurely in response to his request for a mistrial and the extensive delay that plagued his next setting was attributable to the onset of the COVID-19 pandemic in early 2020.

For speedy trial purposes, the 2019 amendment delayed Collins' trial by one month and Collins' brief fails to explain how that one-month delay prejudiced his defense in any material way.

"To evaluate whether a defendant's Sixth Amendment right to speedy trial has been violated, Kansas applies the following four factors set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972): (1) length of delay, (2) reason for the delay, (3) defendant's assertion of his or her right, and (4) prejudice to the defendant. None of these four factors, standing alone, is sufficient for finding a violation. Instead, the court must consider them together along with any other relevant circumstances." *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004).

Considering the four *Barker* factors, we are not persuaded that the delay caused by the 2019 amendment prejudiced Collins' right to a speedy trial. See *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

Collins claims that the 2021 amendment to the complaint surprised him and denied him the right to procedural due process. He argues that, by the time of the trial in 2021, his defense counsel was not prepared to defend against the 2014 date range. Even though counsel initially prepared for that window, those measures were taken, and subsequently abandoned, two years earlier. His assertions are largely conclusory.

This particular amendment triggers our consideration of a frequent occurrence in prosecutions involving child sex crimes. For a variety of reasons, victims of tender years are often unable to recall or assign concrete dates for the acts perpetrated against them. The Kansas Supreme Court recently considered the issue in *White* where, over defense counsel's objection, the State was permitted to amend the date range on the fourth day of trial to correspond with the testimony provided by a victim of child sexual abuse. The original complaint contemplated the entirety of 2009, but that window was extended to span from January 25, 2008, through December 31, 2009. 316 Kan. at 210-11.

On appeal, White argued the amendment deprived him of a potential alibi defense because for the original time frame he had evidence to show that he no longer lived in the home where the offense allegedly occurred. In analyzing White's claim, the court found that the trial testimony failed to develop a cognizable time period for when White actually vacated that residence as witnesses reported he moved out between 2008 and 2010. Ultimately, the court found the district court did not abuse its discretion in permitting the amendment because White "did 'not give any specific reason he did not procure more evidence before trial to support his alibi defense. And the record fails to show that the amendment had any impact on his minimally developed alibi defense.'" 316 Kan. at 214-15 (quoting *State v. White*, 60 Kan. App. 2d 458, 479, 494 P.3d 248 [2021]).

There is no indication from the record before us that Collins' defense was linked to an exact time frame for the alleged offenses. Rather, Karly's uncertainty with respect to the exact dates of the offenses arguably buttressed Collins' primary argument: that her inability to recall precise details of the offenses diminishes her credibility.

We conducted a careful analysis of this claim to ensure Collins' rights were adequately protected. In so doing we failed to detect any indication that the date or time constituted critical issues; that the amendment implicated a statute of limitations or stripped Collins of a viable alibi defense; or that he was otherwise surprised by the

substance of the amendment. Accordingly, we are unable to conclude that the district court abused its discretion in permitting the State to amend its complaint in either instance.

IV. *Did the prosecutor commit reversible error during closing argument?*

Collins' fourth argument on appeal is that the State committed prosecutorial error during closing arguments by engaging in burden shifting that compromised his rights to a fair proceeding and necessitates reversal for a new trial. The State counters that the challenged statements were a valid assessment tool in the form of simple, rhetorical questions posed as points for the jury to ponder when weighing Karly's credibility.

Kansas appellate courts use a two-step process to analyze a challenge advanced against the closing remarks a prosecutor made at trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, we must determine "whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. In the event we conclude error occurred, the State bears the burden to show that "'there is no reasonable possibility that the error contributed to the verdict.'" *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). At this step we may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any identified error is harmless. 313 Kan. at 436-37. Even so, the strength of the evidence is not our primary focus, and we may still find prejudice even in those cases where evidence of a defendant's guilt was particularly compelling. *Sherman*, 305 Kan. at 111.

A prosecutor may not misstate the reasonable doubt standard by which the State is bound, nor may they attempt to shift that burden of proof to the defendant. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014). But courts also grant prosecutors

considerable latitude in discussing weaknesses they identify in the defendant's theory of the case. *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012). We do not consider any statement in isolation but instead consider the context in which the statements were made to determine whether an error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

Collins' counsel did not object to the comments at issue, but that also does not preclude appellate review. That said, an appellate court may consider whether a particular statement drew an objection as part of its analysis for any alleged misconduct. 311 Kan. at 949.

Collins requests that we consider and analyze several of the prosecutor's remarks from closing arguments. Yet all are within the realm of the same general theme and consist of the following:

- "Of any reason why [Karly] would say that this occurred when it didn't. There is no evidence that [Collins] was mad at her or she was mad at him. There is no evidence that he punished her or that—or that somehow there was angst or antipathy or anger between each other."
- "Why would [Karly] make this up? What evidence is there of that? Of any reason [Karly] would say that this occurred when it didn't."
- "Again, no reason why she would say something occurred like this when it didn't."
- "What motive is there to make it up against [Collins]? If she was going to make it up, why didn't she say it happened—he kissed me, and then he touched by breasts, and he touched me 10 times and 20 times and 30 times, every day for a year."
- "Did [Karly] make this up? Why would [Karly] make this up? For what reason would she accuse [Collins] of these crimes?"

31

Collins essentially contends that in uttering these statements the State implied that he had an affirmative burden to produce evidence of his innocence. As support for his claim, Collins directs our attention to *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004).

Tosh was charged with perpetrating unlawful sex acts against his 16-year-old daughter. Given the lack of physical evidence in the case, credibility was a key factor for the jury to consider. The victim testified to the abuse, and Tosh denied committing the acts. He also claimed not to recall giving the confession to a detective that the State introduced into evidence and asserted that during the time in question he was ingesting 180 to 280 tablets of over-the-counter ephedrine each day.

The prosecutor in *Tosh* inquired during closing argument: "'[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?'" 278 Kan. at 90. The Kansas Supreme Court held that the State's questions were impermissible attempts to shift the State's burden, stating briefly: "We consider these comments improper attempts to shift the burden of proof to Tosh. We agree that they must be considered in context, but here the context compounds the error rather than cures it." 278 Kan. at 92. That compounding context was other instances of prosecutorial misconduct, including the State's argument that by taking the case to trial, Tosh effectively raped his daughter two separate times, once physically and then, by requiring her to undergo cross-examination. The State also questioned Tosh's motive for even taking the case to trial given that he already confessed to the crimes. Thus, the context corroborated Tosh's claim that the prosecutor's intention in asking the challenged questions was to imply that Tosh carried the burden to disprove his daughter's claims.

We are not as convinced as Collins appears to be that the *Tosh* court effectively announced a per se rule that, going forward, the State is prohibited from either querying whether evidence exists to support a defendant's theory or highlighting the absence of

32

such supporting evidence. Moreover, the challenged comments simply asked the jury to consider what motive, if any, provided the impetus for Karly's statements. The prosecutor's remarks did not shift the burden of proof to Collins.

Asking a jury to consider what prompted a witness to make a particular statement is within the realm of fair comment. See *State v. Ross*, 310 Kan. 216, 222, 445 P.3d 726 (2019) ("A prosecutor does not shift the burden of proof by highlighting the implausibility of a defendant's account."). In *State v. Ortega*, 300 Kan. 761, 775-76, 335 P.3d 93 (2014), the Kansas Supreme Court recognized:

> "Although it is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, a prosecutor has '"freedom . . . to craft an argument that includes reasonable inferences based on the evidence"' and, 'when a case turns on which [version] of two conflicting stories is true, [to argue] certain testimony is not believable.' For example, it is not improper for a prosecutor to offer 'comments during closing argument regarding the witness' motivations [or lack thereof] to be untruthful.' But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. [Citations omitted.]"

Notably, the Kansas Supreme Court was of the mindset that statements like the ones Collins now challenges as erroneous were not improper even before its opinion in *Ortega*. In *State v. Finley*, 273 Kan. 237, 247, 42 P.3d 723 (2002), it analyzed a prosecutor's comment that Finley and his girlfriend "'are the only ones that really have a motive to fabricate any lies in this case'" and concluded that it was "a fair comment based on reasonable inferences from the evidence." Similarly, in *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009), the court held that a prosecutor's argument that the victim "was not the person who had a 'motive' to be untruthful" was permissible, even though "the natural implication of this statement is that [the defendant] *did* have a motive to conceal the truth," because the "argument was fair and based on the evidence." Finally, in *State v.*

33

*Jordan*, 317 Kan. 628, 649, 537 P.3d 443 (2023), the court concluded that "[t]he prosecutor's rhetorical question inviting jurors to consider what motive [the defendant's passenger] had to be untruthful fell within the bounds of proper argument." Specifically, it stated: "One legitimate factor for the jury to consider in assessing witness credibility is a witness' motive to be dishonest. Thus, we have approved of a prosecutor's use of rhetorical questions to encourage the jury to consider whether a witness has any motive to be untruthful. [Citation omitted.]" 317 Kan. at 649.

Collins' case illustrates precisely why challenged statements must be considered within their proper context when conducting our analysis. At the outset of the State's closing, the prosecutor reminded the jurors of the instruction that defined their responsibility to weigh the credibility of the witnesses and characterized the instruction as "very important" because it communicated that they have the opportunity to simply use their "common sense [and] experience in the ways of [the] world" to analyze the case. The prosecutor then methodically walked the jury through each charged offense, their respective elements, and how the evidence it heard and received satisfied each of those elements.

Because like many prosecutions involving child sex crimes, this case was largely a matter of he-said, she-said, the prosecutor posed the rhetorical question that is now subject to scrutiny—"Why would [Karly] make this up?"—or what evidence was there that she did that very thing. The record reflects that what followed those inquiries, during the first portion of the prosecutor's closing, was a summary of the evidence that reflected the consistent nature of Karly's disclosures and her accounting of the acts that Collins subjected her to.

When it was time for Collins' counsel to address the jury, he essentially endeavored to provide answers to the prosecutor's rhetorical questions. He reminded the jurors that, per their instructions, the State always carries the burden and that the

34

responsibility never shifts to Collins to prove his innocence. His counsel then went on to explain that particular instruction is significant because the State failed to meet its burden. As support for that assertion, Collins' counsel walked the jury through all the deficiencies and ways in which the State's case fell shy of its mark. That portion of counsel's closing prompted the State to revisit the rhetorical questions during its rebuttal closing. But first, the prosecutor returned to the evidence once more and again highlighted the occasions on which Karly gave consistent accounts of the incidents and to whom. He assured the jurors that the State strongly advocated for consideration of the totality of the evidence and that nothing should be disregarded during their deliberations. The prosecutor also reiterated the burden of proof that should guide their decision making—"It is the State's burden to prove these allegations beyond a reasonable doubt."

The comments of which Collins complains did not fall outside the wide latitude that prosecutors are afforded in closing argument when pursuing a fair and just conviction. Thus, we do not need to consider the second step of the analysis that requires us to consider whether the alleged prosecutorial error affected the outcome of the trial. Collins' claim of error on this point fails.

V. *Did cumulative error deny Collins a fair trial?*

Collins' final claim of error that is specific to the guilt-phase of his trial, is that the cumulative effect of the errors he has highlighted denied him a fair trial. Reversal of a defendant's convictions may be warranted if, under the totality of the circumstances, the collective consideration of trial errors demonstrates that a defendant was deprived of their right to a fair trial. In assessing whether this occurred in a given case, appellate courts examine the errors in context and consider how the district court judge addressed the issues when they arose; the nature and number of mistakes and whether they are interrelated; and finally, the overall strength of the evidence. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

"The cumulative error rule does not apply if there are no errors or only a single error." *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). We did not identify any errors in Collins' case. Accordingly, there are no cumulative errors to consider.

VI. *Did the district court properly score Collins' prior out-of-state convictions as person felonies?*

Collins' final argument on appeal is that the district court erred in classifying his prior out-of-state convictions as person felonies. He contends that modification is necessary because those prior offenses play a significant role in calculating his criminal history as A, which in turn gave rise to an illegal sentence in this case. When interpreting sentencing provisions or reviewing a conclusion about the legality of a sentence, our review is unlimited. *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

Pursuant to K.S.A. 21-6814(c), a criminal defendant is required to promptly issue a written notice to the district attorney and the court outlining with particularity any perceived errors in the proposed criminal history worksheet. Upon receipt of the written notification, the State then bears the additional burden of "proving the disputed portion of the offender's criminal history." K.S.A. 21-6814(c). But if the criminal history is established and the offender stands silent, the burden of proof shifts to the offender to prove their criminal history by a preponderance of the evidence. K.S.A. 21-6814(c).

Under the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-6801 et seq., criminal sentences are determined by the intersection of two factors: the defendant's criminal history and the severity level of the crime committed. K.S.A. 21-6804(c). An offender's criminal history is the accumulation of all their felony juvenile adjudications, certain misdemeanor convictions and adjudications, and all adult felonies. K.S.A. 21-6810(a), (d). Felonies are given greater weight than misdemeanors and, therefore, result in higher presumptive sentences. Similarly, those offenses committed against another

36

person or people typically also carry more substantial consequences. See *State v. Keel*, 302 Kan. 560, 574-75, 357 P.3d 251 (2015). The score assigned for an offender's criminal history can range from I, for those who have either no criminal history or merely one misdemeanor, to A, the designated classification after an offender commits three or more person felonies.

We will not delve too deeply into the growing pains the criminal history corner of the KSGA endured over the course of roughly the past decade. One basic principle to bear in mind is that the version of the statute that we must apply is the one that was in effect at the moment the *current* crime of conviction was committed. Collins committed the crimes in this case at some point between 2011 and May 31, 2014. Thus, he takes the position that the district court should have applied the comparability test outlined under K.S.A. 2013 Supp. 21-6811(e). For purposes of that particular analysis, an out-of-state offense can only be classified as a person offense when "the elements of the out-of-state crime [are] identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." *State v. Wetrich*, 307 Kan. 552, Syl. ¶ 3, 412 P.3d 984 (2018).

Although *Wetrich* was abrogated by the statutory amendment of K.S.A. 2019 Supp. 21-6811(e)(3)(B), the *Wetrich* comparability test must still be applied in Collins' case because he committed the crimes before the 2019 amendment was enacted. *State v. McCray*, 321 Kan. 439, 443, 580 P.3d 682 (2025). Collins argues that none of his prior out-of-state offenses have elements identical to, or narrower than, any person offense in Kansas.

In response, the State argues that the district court correctly determined Collins' criminal history score. The State contends that the elements of Collins' prior out-of-state offenses are all identical to, or narrower than, their comparable Kansas person offenses. The State also argues that for one of Collins' prior convictions, he failed to designate a record that would allow this court to review comparability for the first time on appeal

because the journal entry he provided does not include the specific subsection of the statute he was convicted under.

There is no dispute that Collins' prior convictions constituted felonies. Likewise, the State does not dispute that the Kansas Supreme Court's holding in *Wetrich* applies based on the date of Collins' current crimes of conviction. As a result, the only issue is whether the prior convictions should be classified as person or nonperson felonies.

*Additional relevant facts*

Following Collins' conviction at trial, a presentence investigation report stated that his criminal history score for the primary offense of attempted rape was A based on three out-of-state convictions for person felonies that were aggregated. The first prior conviction was his 1993 Missouri conviction for first-degree sexual abuse in violation of Mo. Rev. Stat. § 566.100. The second prior conviction was also a 1993 Missouri conviction, this one for second-degree assault contrary to Mo. Rev. Stat. § 565.060. Rounding out the three was a 2017 conviction from Oklahoma for failing to comply with Oklahoma's Sex Offenders Registration Act under Okla. Stat. tit. 57, § 583.

Collins' current crimes of conviction are off-grid offenses. These are the most egregious crimes in the class of felonies and typically carry mandatory sentencing terms of life imprisonment that operate independently from the sentencing guidelines grid. The sex offenses Collins was convicted of fall within a special class of crimes known as Jessica's Law offenses. These are serious sexual crimes perpetrated against children that trigger mandatory minimum sentences of 25 or 40 years to life imprisonment under K.S.A. 2013 Supp. 21-6627. Collins' situation is somewhat unique in that for his primary crime of conviction, aggravated criminal sodomy, he was sentenced to serve a life sentence without the possibility of parole for 620 months (approximately 52 years) through the operation of K.S.A. 2013 Supp. 21-6627(a)(2)(B) and (b)(2)(B).

Essentially, K.S.A. 2013 Supp. 21-6627(a)(2)(B) operates as an exception to K.S.A. 2013 Supp. 21-6627(a)(1) and its mandatory minimum prison term of 25 years. That exception states: "[T]he defendant, because of the defendant's criminal history classification, is subject to presumptive imprisonment pursuant to the sentencing guidelines grid for nondrug crimes and the sentencing range exceeds 300 months." K.S.A. 2013 Supp. 21-6627(a)(2)(B). If that exception applies, before a defendant is eligible for parole, they are "required to serve a mandatory minimum term equal to the sentence established . . . pursuant to the sentencing range." K.S.A. 2013 Supp. 21-6627(a)(2)(B). Then, for the attempted rape conviction, Collins was sentenced in accordance with K.S.A. 2013 Supp. 21-6627(a)(1)(B), and received a concurrent life term that required him to serve 300 months before he was eligible for parole.

Effective July 1, 2022, the Legislature amended K.S.A. 21-6814 to address appellate review of criminal history score challenges raised for the first time on appeal:

> "If an offender raises a challenge to the offender's criminal history for the first time on appeal, the offender shall have the burden of designating a record that shows prejudicial error. If the offender fails to provide such record, the appellate court shall dismiss the claim. In designating a record that shows prejudicial error, the offender may provide the appellate court with journal entries of the challenged criminal history that were not originally attached to the criminal history worksheet, and the state may provide the appellate court with journal entries establishing a lack of prejudicial error. The court may take judicial notice of such journal entries, complaints, plea agreements, jury instructions and verdict forms for Kansas convictions when determining whether prejudicial error exists. The court may remand the case if there is a reasonable question as to whether prejudicial error exists." K.S.A. 21-6814(d).

*A portion of the district court's criminal history calculation was erroneous.*

As stated above, the *Wetrich* "identical-or-narrower" rule controls the scoring of Collins' prior out-of-state convictions because the offenses in the current case were

39

committed between 2011 and 2014, before the adoption of K.S.A. 2019 Supp. 21-6811(e)(3)(B). See *Keel*, 302 Kan. 560, Syl. ¶ 9 (Criminal history scores are calculated using the law in effect at the time the current offense was committed.). Specifically, that rule mandates that "the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." *Wetrich*, 307 Kan. at 562. "If the state of Kansas does not have a comparable offense, the out-of-state conviction shall be classified as a nonperson crime." K.S.A. 2013 Supp. 21-6811(e). On appeal, Collins argues that all three of his prior out-of-state felony convictions have broader elements than their comparable Kansas offenses and thus cannot be considered person offenses for purposes of criminal history scoring.

### 1. *2017 Oklahoma conviction for failure to register as a sex offender*

In support of his argument that the district court erred in its classification of his prior offense, Collins provided us with a copy of the journal entry of judgment and sentence as an attachment to his brief. K.S.A. 21-6814(d) provides the mechanism for us to take judicial notice of those documents. According to the Oklahoma journal entry, Collins failed to register as a sex offender on or about November 6, 2014, and was convicted of violating Okla. Stat. tit. 57, § 583.

The latest version of that provision went into effect on November 1, 2014, just five days before Collins violated the statute. Under this version of the statute:

> "Any person who has been convicted of an offense or received a deferred judgment for an offense in another jurisdiction, which offense if committed or attempted in this state, would have been punishable as one or more of the offenses listed in Section 582 of this title and who enters this state *on or after November 1, 1989*, shall register, in person, as follows . . . ." (Emphasis added.) Okla. Stat. tit. 57, § 583(B).

In comparison, a sex offender in Kansas can only be charged with violation of the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., if they are convicted of a sexually violent crime on or after April 14, 1994. K.S.A. 2013 Supp. 22-4902(b)(1); K.S.A. 2013 Supp. 22-4903(a). This April 14, 1994 cutoff is present in each version of the Kansas statutes in effect during the date range that Collins committed his current offenses in this case. See K.S.A. 2010 Supp. 22-4902(b); K.S.A. 2011 Supp. 22-4902(b)(1); K.S.A. 2012 Supp. 22-4902(b)(1).

Collins argues that Oklahoma's earlier cutoff date for sex offender registration means that the Oklahoma failure to register offense has broader elements than Kansas' failure to register offense. The State counters that the focus of Collins' argument is misdirected because he is relying on the disparity in the enactment dates of the offenses between the two states, as opposed to their actual elements.

We concluded that Collins has a stronger argument. While the State is correct that the dates at issue coincide with when the respective jurisdictions enacted their sex offender registration statutes, those dates likewise constitute elements for the offense of failure to register. To be sure, for a defendant to fall within the scope of the offense, in either State, they must have committed a sexually violent crime on or after those statutorily enumerated dates.

Given that the disparity between the dates at issue allows for a wider window in which the violation may occur in Oklahoma, we find that the elements required to prove a registration violation in that state are broader than the elements underlying the same offense in Kansas. Accordingly, Collins' 2017 Oklahoma conviction for failure to register as a sex offender must be scored as a nonperson offense in his criminal history classification.

## 2. *1993 Missouri conviction for second-degree assault*

The second portion of this issue focuses on Collins' 1993 Missouri conviction for second-degree assault. As with the Oklahoma conviction, Collins also provided us with a copy of the charging document and journal entry of judgment and sentence as support for his claim. According to those documents, on or about September 15, 1993, Collins attempted to cause physical injury to another person by holding a knife to the person's throat, in violation of Mo. Rev. Stat. § 565.060 (1993).

As the State points out, the district court documents provided by Collins do not specify which subsection of the Missouri second-degree assault statute he was convicted under. However, as discussed below, the information he has provided is sufficient to enable us to conclude that he was convicted under subsection 1.(2) of that provision. Mo. Rev. Stat. § 565.060 (1993).

The Missouri second-degree assault provision is classified as a divisible statute. That type of statute includes multiple alternative versions of the crime and at least one of those options corresponds with the elements of the generic offense. *State v. Dickey*, 301 Kan. 1018, 1037-38, 350 P.3d 1054 (2015). It "criminalizes a broader swath of conduct than the relevant generic offense." *Descamps v. United States*, 570 U.S. 254, 258, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013). Frequently, if a defendant's prior conviction arises under a divisible statute, it may be difficult to determine, from merely reviewing the elements, which of those alternatives provided the foundation for the defendant's prior conviction. *Dickey*, 301 Kan. at 1037-38. It is that potential for ambiguity which enables us to review the documentation Collins provided to assist with the review of this claim. K.S.A. 21-6814(d); see also *Johnson v. United States*, 559 U.S. 133, 144, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010) (When seeking to identify the precise prior conviction that arose out of a divisible statute, a court may examine a limited class of documents including, charging documents, plea agreements, jury instructions, verdict forms, and

transcripts from plea colloquies as well as findings of fact and conclusions of law from a bench trial.). This process is known as the modified categorical approach. It does not permit us to consider the underlying facts when determining comparability. Rather, it is merely a tool to get to the categorical approach, which compares only the elements of the crimes. See *State v. Gensler*, 308 Kan. 674, 682-84, 423 P.3d 488 (2018).

With that backdrop, we turn to the elements of second-degree assault under Mo. Rev. Stat. § 565.060 (1993):

> "1. A person commits the crime of assault in the second degree if he:
>
> (1) Attempts to kill or knowingly causes or attempts to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause; or
>
> (2) Attempts to cause or knowingly causes physical injury to another person by means of a deadly weapon or dangerous instrument; or
>
> (3) Recklessly causes serious physical injury to another person; or
>
> (4) While in an intoxicated condition or under the influence of controlled substances or drugs, operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause physical injury to any other person than himself." Mo. Rev. Stat. § 565.060 (1993).

According to the documentation we received from Collins, he "attempted to cause physical injury to [the victim] by holding a knife to her throat" and ultimately pleaded guilty to second-degree assault. The statute contains a total of four subsections but only the first two address the attempt to cause physical injury. Aligning the information from Collins with the content of the statute, it appears he pleaded guilty to violating subsection (2) of that provision. Missouri's code defines a "dangerous instrument" as "any

instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." Mo. Rev. Stat. § 556.061(9) (1993). It defines a "deadly weapon," in relevant part, as "a switchblade knife, dagger, billy, blackjack or metal knuckles." Mo. Rev. Stat. § 556.061(10) (1993). A knife could arguably fall within either or both of those definitions. While subsection 1.(1) of Mo. Rev. Stat. § 565.060 also addresses the attempted commission of assault, there is nothing contained within the information Collins provided that would allow for the conclusion that sudden passion was the impetus for his criminal conduct.

Our next step is to determine whether these elements are comparable to an offense in Kansas that was statutorily provided for at the time of the commission of his Missouri crime. See *State v. Hayes*, No. 123,359, 2021 WL 5408677, at *2 (Kan. App. 2021) (unpublished opinion). The State encourages us to consider aggravated battery under K.S.A. 2011 Supp. 21-5413(b), and aggravated assault under K.S.A. 2013 Supp. 21-5412 are comparable offenses. But the elements of Mo. Rev. Stat. § 565.060.1(2) (1993) are not identical to, or narrower than, either Kansas offense.

Between January 1, 2011, and May 31, 2014, the definition of aggravated battery in Kansas changed significantly. From January 1, 2011, to June 30, 2011, aggravated battery was defined by K.S.A. 2010 Supp. 21-3414(a) as:

> "(1) (A) Intentionally causing great bodily harm to another person or disfigurement of another person; or
>
> (B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or
>
> (C) intentionally causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

"(2) (A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

Then, effective July 1, 2011, the amended version of aggravated battery went into effect. K.S.A. 2011 Supp. 21-5413(b)(1)(A), (B), and (C) modified the culpable mental state from "intentionally" to "knowingly"; subsection (2) remained the same.

The contents of the aggravated battery statute then remained consistent through May 31, 2014, with the exception of an added subsection, (b)(3), to include aggravated battery while driving under the influence. Therefore, in the interest of simplicity, our analysis will be limited to the 2011 version of the statute.

Before launching into an analysis of those elements, an additional factor that cannot be overlooked, and one that is critical to our analysis, is that Collins did not complete the commission of his prior conviction, it was merely attempted. Collins highlights the fact that Missouri and Kansas adhere to different interpretations of "attempt." Missouri follows the "substantial step" rule, whereas on the other side of the state line, we follow the "overt act" rule. Under certain circumstances, Missouri's theory allows "mere preparation" to support a conviction for the attempted commission of a crime. *State v. Kusgen*, 178 S.W.3d 595, 599 (Mo. Ct. App. 2005). By contrast, the law in Kansas demands something more. "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2013 Supp. 21-5301(a). To establish guilt "'[t]he accused must have taken steps beyond mere preparation by doing something directly moving toward and bringing nearer the crime he intends to commit.'" *State v. Larsen*, 317 Kan. 552, 563, 533 P.3d 302 (2023) (quoting *State v. Garner*, 237 Kan. 227, 238, 699 P.2d 468 [1985]).

45

A panel of this court previously conducted a comprehensive analysis of this very issue and concluded that "[b]ased on the statutory elements of the relevant statutes, as well as on the decisional law interpreting them, we find the elements of attempt in Missouri to be broader than the elements of attempt in Kansas." *State v. Jones*, No. 117,808, 2018 WL 4656409, at *8 (Kan. App. 2018) (unpublished opinion). That decision was subsequently reaffirmed by a separate panel in *State v. Jackson*, 60 Kan. App. 2d 424, 438, 494 P.3d 225 (2021). These findings render it unnecessary for us to conduct a protracted analysis of the elements for assault and any conceivable Kansas offense that might be comparable. The difference in "attempt" between the two states is sufficient to render the two crimes incomparable and produce an incorrect criminal history score that resulted in an illegal sentence.

### 3. *1993 Missouri conviction for first-degree sexual abuse*

In his final claim under this issue Collins contends that none of the potentially comparable Kansas offenses are broader than Missouri's first-degree sexual abuse provision. The prior conduct that ultimately prompted Collins' guilty plea in Missouri was for subjecting a person less than 12 years old to sexual contact.

The State counters that K.S.A. 21-5506(b)(3) illustrates that aggravated indecent liberties with a child is a comparable offense. As support, it highlights that Missouri's offense of first-degree sexual abuse is narrower than this comparable Kansas crime in two respects—its definition of "sexual conduct" is broader than what is encompassed by Kansas' definition of "lewd touching"; and the top end for the age of a Missouri victim is 12 years old, whereas application of aggravated indecent liberties extends to victims that are 13 years of age.

During the time frame at issue, Missouri's first-degree sexual abuse provision explained that a person commits an act in violation of the statute if they "subject[]

another person who is less than twelve years old to sexual contact." Mo. Rev. Stat. § 566.100.1(2) (1993). "Sexual contact" is then defined as "any touching of the genitals or anus of any person, or the breast of any female person, or any such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person." Mo. Rev. Stat. § 566.010(2) (1993).

In comparison, during that same time period, Kansas' statute for aggravated indecent liberties with a child detailed that the crime occurs when an offender subjects a child under 14 years of age to "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 2010 Supp. 21-3504(a)(3)(A); K.S.A. 2011 Supp. 21-5506(b)(3)(A). Kansas defines "lewd touching" as physical contact by the defendant that is "'sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; indecent, obscene, salacious'" and that which "'tends to undermine the morals of a child [and] . . . is so clearly offensive as to outrage the moral senses of a reasonable person.'" *State v. Ta*, 296 Kan. 230, 242-43, 290 P.3d 652 (2012).

Having concluded that the age and actus reus elements are broader under the Kansas crime, we turn our focus to the respective mental states for each offense. A guilty finding can be made in Missouri when the offender engages in "sexual contact" specifically "for the purpose of arousing or gratifying the sexual desire *of any person*." (Emphasis added.) Mo. Rev. Stat. § 566.010(2) (1993). By contrast, Kansas limits its reach to "either the child or the offender, or both." K.S.A. 2011 Supp. 21-5506(b)(3)(A). Our conclusion with respect to this factor establishes that the elements of the Missouri offense are not identical to, or narrower than, those of the Kansas crime, as required to properly be designated as a person felony.

*Conclusion*

None of the three prior out-of-state convictions that were designated as person felonies when calculating Collins' criminal history score proved comparable to Kansas offenses under the *Wetrich* analysis. Accordingly, we must find that the district court erred when it imposed sentence based on a criminal history score of A. See K.S.A. 21-6809 (Criminal history score of A requires three or more prior convictions for person felonies.). Collins' sentence must be vacated and his case remanded for resentencing with a corrected criminal history score.

## CONCLUSION

We appreciate the various complexities, considerations, and sensitivities involved in cases of this nature. That awareness ensures we afford each claim and counterargument careful consideration. That being said, no trial is without its flaws. But defendants are entitled to just trials, not perfect ones. The record before us bore out that defendant was afforded the fair trial he had a right to receive.

Convictions affirmed, sentence vacated, and case remanded with directions.